[redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| **In Re: Rare Breed Triggers Patent Litigation** | **4:26-md-03176-ALM**<br>**MDL 3176** |
| ABC IP, LLC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>STEVEN THANH NGUYEN, d/b/a POLYMER PEW,<br><br>Defendant. | Civil Action No. 4:26-cv-00425-ALM |

[redacted]

**DECLARATION OF STEVEN THANH NGUYEN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' CONSOLIDATED MOTION FOR PRELIMINARY INJUNCTION**

I, Steven Thanh Nguyen, declare as follows:

1. My name is Steven Thanh Nguyen. I do business as Polymer Pew. I submit this declaration in support of Defendants' Opposition to Plaintiffs' Consolidated Motion for Preliminary Injunction. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could and would testify competently to them.

2. I am an individual doing business as Polymer Pew from my residence in Rosenberg, Texas. Polymer Pew is not a separate legal entity; it is my sole proprietorship.

3. Polymer Pew is, in substance, a one-person operation. I personally perform substantially all of the business's functions, including product sourcing and preparation, listings,

order fulfillment, customer service, and record keeping. Polymer Pew has no employees other than me.

4. Under the Polymer Pew name, I sell Super Safety parts and kits and resell the ARC-Fire manufactured by AS Designs.

5. The kits are modular: they supply certain components (such as the cam, lever, and a pre-cut trigger), and the customer supplies or reuses the remaining standard fire-control parts and performs the installation.

6. Based on my experience selling to customers of forced reset trigger ("FRT") products, customers commonly switch between FRT products for many reasons, including product failures; preferences in trigger feel, shape, and look; functionality differences; curiosity; and spur-of-the-moment purchasing. The firearms-accessories market has many customers with varied and changing preferences, wants, and needs, and customers sometimes change out a product merely out of curiosity or to try something new.

7. Switching costs for users are insignificant. A customer who installs one FRT product is not wedded to that platform or style; the customer can readily remove it and install a different product, reusing standard fire-control components.

8. Polymer Pew's customers are generally do-it-yourself ("DIY") firearm enthusiasts and hobbyists who affirmatively want lower-priced, modular components that they can install, uninstall, reinstall, service, and combine with other parts of their choosing, including third-party triggers.

9. In my experience, Polymer Pew's customers understand that my prices are lower than Rare Breed's prices in significant part because the products are modular and install-it-

yourself: the customer supplies or reuses several standard fire-control components and performs the installation, rather than buying a complete, closed drop-in assembly at a premium price.

10. The modularity is itself a selling point. Customers can later switch or upgrade trigger assemblies—for example, to a higher-end trigger or simply a different style of trigger—without replacing an entire drop-in unit. In my experience, this is a strong selling point and an advantage over Rare Breed's closed, drop-in products.

11. Repeat purchasing is common. Customers purchase additional or different FRT products for additional rifles, purchase replacement or upgrade components, and try different products over time.

12. I have seen a growing number of customers who want two-stage triggers, or who at least want the option to install one. The modular products Polymer Pew sells are compatible with two-stage triggers. I understand that Rare Breed's single-stage FRT-15L3 does not offer that option.

13. The Super Safety replaces the rifle's standard safety selector with a push-button cam—a visibly and functionally different user interface from a standard selector and from Rare Breed's drop-in units. In my experience, a reasonably knowledgeable customer recognizes this difference when making the purchasing decision, and the difference is immediately apparent once the product is installed, so the customer would not be confused about whose product is installed. The selector-style products Polymer Pew sells (such as the ARC-Fire) use ambidextrous selector-style switches and modular components that likewise look, install, and operate differently from Rare Breed's drop-in cassette assemblies.

14. Polymer Pew has never sold any products to East Valley Tactical.

15. Polymer Pew continues to sell its products in the ordinary course of business.

16. Polymer Pew has not asked or required any dealer or customer to make product-specific investments in training, compliance processes, or inventory, and I am not aware of any dealer or customer that has declined to purchase or carry Rare Breed products because of Polymer Pew.

17. I have invested substantial personal time and money in developing and commercializing Polymer Pew's products and business, including product development and testing, tooling and fixtures, inventory, website and marketing, and building my customer base. I have spent over 400 hours alone just to develop and test a single product. The Polymer Pew website and social account takes up to 8 / day just to maintain and answer questions to farther educate customers how each part work and what is needed for their personal firearms. I have over 2000 followers on Facebook that watch my page daily for advice on how to install and new product release.

18. Polymer Pew is a non-diversified business. The accused products and related or similar firearm mechanisms are the core of my operations and account for substantially all of my revenue. Polymer Pew has no other product line that could meaningfully replace those sales.

19. The investments described above are largely sunk. They could not be recovered if Polymer Pew were enjoined, and the inventory Polymer Pew holds would be stranded.

20. Polymer Pew's total revenue from the accused product categories over the trailing twelve months is [redacted] Based on my knowledge of Polymer Pew's finances, Polymer Pew could pay a judgment based on a reasonable royalty in the range of 5% to 8% of its accused sales.

21. Because Polymer Pew is a one-person business, the requested preliminary injunction would not merely restrict a product line—it would effectively shut down the business

and eliminate my livelihood. It would strand inventory, destroy the goodwill and customer relationships I have built, disrupt Polymer Pew's suppliers, and destroy the value of my sunk investments—all before any determination on the merits of Plaintiffs' claims, which Polymer Pew disputes.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on Aug 10, 2026.

Steven Thanh Nguyen