[redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| **In Re: Rare Breed Triggers Patent Litigation** | **4:26-md-03176-ALM**<br>**MDL 3176** |
| ABC IP, LLC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>80MILLS LLC, d/b/a TACTICAL TITAN SUPPLY, *et al.*,<br><br>Defendants. | Civil Action No. 4:26-cv-00380-ALM |

[redacted]

**<u>DECLARATION OF PEARSON GARDNER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' CONSOLIDATED MOTION FOR PRELIMINARY INJUNCTION</u>**

I, Pearson Gardner, declare as follows:

1. My name is Pearson Gardner. I am the sole member and manager of 80Mills LLC, d/b/a Tactical Titan Supply ("80Mills"). I submit this declaration in support of Defendants' Opposition to Plaintiffs' Consolidated Motion for Preliminary Injunction. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could and would testify competently to them.

2. 80Mills is a Wyoming limited liability company formed on January 19, 2024, and registered to transact business in Ohio as a foreign limited liability company since February 14, 2024. I am its sole member and manager, and 80Mills operates from Chardon, Ohio.

3. 80Mills is, in substance, a one-person operation. I personally perform substantially all of the business's functions, including product sourcing and preparation, listings, order fulfillment, customer service, and recordkeeping. 80Mills has no employees other than me.

4. 80Mills sold Super Safety mechanisms and Super Safety kits and components under its Tactical Titan Supply brand.

5. The kits are modular: they supply certain components (such as the cam, lever, and a pre-cut trigger), and the customer supplies or reuses the remaining standard fire-control parts and performs the installation.

6. Based on my experience selling to customers of forced reset trigger ("FRT") products, customers commonly switch between FRT products for many reasons, including product failures; preferences in trigger feel, shape, and look; functionality differences; curiosity; and spur-of-the-moment purchasing. The firearms-accessories market has many customers with varied and changing preferences, wants, and needs, and customers sometimes change out a product merely out of curiosity or to try something new.

7. Switching costs for users are insignificant. A customer who installs one FRT product is not wedded to that platform or style; the customer can readily remove it and install a different product, reusing standard fire-control components.

8. 80Mills' customers were generally do-it-yourself ("DIY") firearm enthusiasts and hobbyists who affirmatively want lower-priced, modular components that they can install, uninstall, reinstall, service, and combine with other parts of their choosing, including third-party triggers.

9. In my experience, 80Mills' customers understand that its prices were lower than Rare Breed's prices in significant part because the products were modular and install-it-yourself:

the customer supplies or reuses several standard fire-control components and performs the installation, rather than buying a complete, closed drop-in assembly at a premium price.

10. The modularity is itself a selling point. Customers can later switch or upgrade trigger assemblies—for example, to a higher-end trigger or simply a different style of trigger—without replacing an entire drop-in unit. In my experience, this is a strong selling point and an advantage over Rare Breed's closed, drop-in products.

11. Repeat purchasing is common. Customers purchase additional or different FRT products for additional rifles, purchase replacement or upgrade components, and try different products over time.

12. I have seen a growing number of customers who want two-stage triggers, or who at least want the option to install one. The modular products 80Mills sold were compatible with two-stage triggers. I understand that Rare Breed's single-stage FRT-15L3 does not offer that option.

13. The Super Safety replaces the rifle's standard safety selector with a push-button cam—a visibly and functionally different user interface from a standard selector and from Rare Breed's drop-in units. In my experience, a reasonably knowledgeable customer recognizes this difference when making the purchasing decision, and the difference is immediately apparent once the product is installed, so the customer would not be confused about whose product is installed.

14. 80Mills has never sold any products to East Valley Tactical.

15. 80Mills is not currently selling any accused products; it suspended those sales. 80Mills would like to resume its business if and when it is lawfully permitted to do so, and an injunction would foreclose that ability and impose the harms described below.

16. 80Mills has not asked or required any dealer or customer to make product-specific investments in training, compliance processes, or inventory, and I am not aware of any dealer or customer that has declined to purchase or carry Rare Breed products because of 80Mills.

17. I have invested substantial personal time and money in developing and commercializing 80Mills' products and business, including product development and testing, tooling and fixtures, inventory, website and marketing, and building its customer base. Specifically, I developed the trigger-cut specifications and drawings and worked with an outside engineering firm, Harbinger Engineering, on component design and CNC machining, drawing on my prior manufacturing experience at Ohio Ordnance Works. That work included pre-cut and post-cut CAD models for the trigger modification, revised cam and lever designs to make the parts easier to machine, and evaluation of tool-steel materials including 4140, A2, D2, and S7; I paid [redacted] for engineering and machining services. I purchased a 3D printer and used it to prototype parts, and I performed live function testing of assembled configurations. I also developed fixturing to allow customers to mill triggers themselves on a GG3 desktop CNC machine, designed custom end mills, worked with forging vendors to explore custom forged triggers and safeties, and sourced and tested custom component configurations, including different springs and weights. 80Mills' books separately record approximately $2,062 in prototyping and tooling equipment and approximately $1,321 in small tools.

18. 80Mills is a non-diversified business. The accused products and related or similar firearm mechanisms were the core of its operations and account for substantially all of its revenue. 80Mills has no other product line that could meaningfully replace those sales.

19. The investments described above are largely sunk. They could not be recovered if 80Mills were enjoined, and the inventory 80Mills holds would be stranded.

20. In the twelve months preceding its suspension of sales, 80Mills' total revenue from the accused product categories was [redacted] Based on my knowledge of 80Mills' finances, 80Mills could pay a judgment based on a reasonable royalty in the range of 5% to 8% of its accused sales.

21. Because 80Mills is a one-person business, the requested preliminary injunction would not merely restrict a product line—it would foreclose the business's ability to operate and eliminate my livelihood. It would strand inventory, destroy the goodwill and customer relationships I have built, disrupt 80Mills's suppliers, and destroy the value of my sunk investments—all before any determination on the merits of Plaintiffs' claims, which 80Mills disputes.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 12th, 2026.

Pearson Gardner